# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

JOSEPHINE SMALLS MILLER     :
    Plaintiff              :
                           :
        v.              :        3:05-cv-402 (CFD)
                           :
PRAXAIR, INC., DENNIS REILLY,    :
DAVID CHAIFETZ, JOHN DAY      :
    Defendants.            :

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

The plaintiff, Josephine Miller,[1] brought this action against her former employer, Praxair,

Inc. ("Praxair"), and three Praxair employees: Chief Executive Officer Dennis Reilly, General

Counsel David Chaifetz, and Chief Human Resources Counsel John Day.  Praxair is a

manufacturer of industrial and specialty gases headquartered in Danbury, Connecticut.  Plaintiff

alleges against Praxair the following: constructive discharge in violation of Connecticut General

Statutes Sec. 31-51q; the Connecticut Fair Employment Practices Act ("CFEPA"); Title VII of

the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the public policy of the

State of Connecticut and the United States of America; an implied contract and covenant of good

faith and fair dealing; Connecticut General Statutes Sec. 31-290a[2]; 42 U.S.C. § 1981 of the Civil

Rights Acts of 1866; and 31 U.S.C. § 3730(h) of the False Claims Act.  Plaintiff also alleges

against Praxair race and gender harassment and retaliation in violation of CFEPA, Title VII, and

42 U.S.C. § 1981.  Remaining against the individual defendants are plaintiff's claims for:

---

[1]The plaintiff, an attorney, is representing herself.

[2]Conn. Gen. Stat. 31-290a prohibits discrimination for exercising rights under the
Connecticut Workers' Compensation statutes.

violation of Connecticut General Statutes Sec. 31-51q[3]; discrimination in violation of CFEPA

and 42 U.S.C. § 1981; tortious interference with contract; and constructive discharge in violation

of Connecticut General Statutes Sec. 31-290a, 42 U.S.C. § 1981, and 31 U.S.C. § 3730(h) of the

False Claims Act.  She is seeking compensatory and punitive damages.  Pending are Praxair's

and the individual defendants' motions for summary judgment.  For the following reasons, those

motions are granted.

## I.   **Background**[4]

Miller is a black female who was employed as in-house counsel at Praxair's Danbury

office from September 1990 through September 2002.  In September 2002, Miller resigned her

position with the company.  The parties agree that Miller performed "at least to expectations"

throughout her tenure at Praxair, and that she received substantial pay increases and bonuses

during the last years of her employment with the company.  In general, Miller claims that a series

of incidents beginning in 2000 resulted in her forced resignation in 2002.  Those incidents

follow.

The Diversity Initiative

On or about January 2000, Praxair instituted a Diversity Initiative with the express

purpose of increasing the number of African-American males working at the company.  Miller

came to believe that there were deliberate efforts to thwart the initiative by "terminat[ing]

---

[3]Conn. Gen. Stat. § 31-51q generally prohibits retaliation for employees' exercise of free speech rights.

[4]The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submitted by the parties. They are undisputed unless otherwise indicated.

African Americans as quickly as they were hired."

<u>Managing Attorney</u>

In or about March 2000, Miller was made Managing Attorney for Praxair's legal department.[5]  In this capacity, she spent about five percent of her time on management responsibilities, and split the remainder of her time between general liability cases and employment cases.  In her employment work, she reported to defendant, John Day.  In her general liability work, she reported to Richard Tisch, who is not a defendant here.

<u>The Severance Pay Plan</u>

In October 2000, at then General Counsel Chaifetz's suggestion, Miller wrote a proposal to modify Praxair's Severance Pay Plan.  The Severance Pay Plan had been designed and drafted by Day.  Miller claims that Day did not want to change the plan.  On November 19, 2000, when Day found out that Miller had written and submitted the proposal to Chaifetz without Day's input or supervision, he wrote her an email.  A portion of that email read as follows:

> I am fine with your working directly with Dave [Chaifetz], and vigorously debating or taking issue - within the Department - with my/our positions. However you need to clearly understand - and accept - several expectations I have, none of which were met here:
> - I will be kept at least topically abreast of all significant labor work and projects
> - I will review in advance any policy proposals [or response to client proposals] or major initiatives before communication either to Dave or outside the Department
> - you will not work with clients to oppose Department positions with which you disagree; you will address those issues first with me, and, if unsatisfied with the outcome, with Dave.  For our clients' purposes we should speak with one voice

---

[5]"Managing Attorney" of the law department included budgeting responsibilities and oversight of the non-lawyer staff.

Miller alleges that this email was meant to prohibit her from "communicating with Chaifetz or outside the legal department on any policy proposals or major initiatives, a comprehensive and overly broad statement that could encompass almost any matters relevant to the workplace, including diversity, human resources, or even complaints of discrimination."

### Meeting with CEO Reilly

On October 27, 2000, Miller became "convinced that higher level managers, including John Day, Del Shannon and others were intent upon terminating a recently hired black female, Stephanie Benjamin-Coleman."  On October 29, she met with CEO Dennis Reilly to "talk about her beliefs regarding the failure of the Diversity Initiative, the regression in hires of higher level African-Americans and in particular, her belief that Benjamin-Coleman was targeted for discriminatory discharge."

Miller later learned that on October 30, 2000, Reilly contacted Chaifetz to inform him of his conversation with her, and that Reilly instructed Chaifetz to "ensure that our people are balanced."

On November 3, 2000, Miller told Chaifetz about her conversation with Reilly.  Miller claims that Chaifetz told Miller that "most senior managers were opposed to the Diversity Initiative but were going along with in order to be politically correct."

### Threat to Outsource General Liability Work

On November 10, 2000, in a law department budget meeting, Chaifetz presented what he called a "radical idea," and which Miller perceived as a threat, to outsource the general liability litigation work.  Praxair's general liability litigation work was performed half-time by Miller and full-time by one other attorney.  It is undisputed that Praxair never outsourced this work.

<u>Computer "Hacking"</u>

Miller alleges the defendants "hacked into" her computer.  The facts of this allegation are hazy, but Miller claims that after opening an email from John Day, she noticed an icon on her computer screen that allowed her to read the emails of a former Praxair employee, Stephanie Benjamin-Coleman.  Miller suspects that one or more of the defendants may have taken action that would allow others to read her emails as well.  In response to the Miller's inquiries at the time she noticed the icon, the IT department followed-up and provided an alternative explanation for the icon and Miller's being able to read Benjamin-Coleman's emails.

Performance Evaluation

In early 2002, Miller received a written performance evaluation for 2001.  It was the first time Praxair had conducted such an evaluation in six or seven years.  Associate General Counsel William McClure drafted the evaluation.  John Day completed the final evaluation, and did not ask for input from Richard Tisch, Miller's supervisor on general litigation matters.  Day maintained McClure's rating of Miller as "meets expectations," but altered some of the evaluation's narrative language.  The McClure draft read as follows:

> Ms. Miller provides legally sound advice to her clients in a professional manner that is well received.  She is customer focused and is careful to explain options to her clients in terms that can be understood by a layperson.  She is very supportive of human resource managers, and in particular newer and less-experienced HRMs. While most clients find that she responds promptly to their inquiries, a few mentioned that on occasion she is unavailable and does not respond promptly. Many of those objections could be avoided if Ms. Miller were to leave notice of her absences on her voicemail and via the Lotus Notes "Out of the Office" Feature.  Ms. Miller's skills in negotiating settlements are also praised; as was her ability to 'wear three hats' (labor, third party liability, safety) in addressing accident litigation involving third parties.  As part of her development, the PDI group would like Ms. Miller to participate in one of the PDI HR semi-annual management meetings.

Day's final evaluation read as follows:

> Even though she sometimes has to deliver disappointing news, Jo [Miller] provides legally sound advice to her clients in a professional manner that is generally well received; with a few HR clients some mutual bridge-building may be helpful.  She is careful to explain options to her clients in terms that can be understood by a layperson.  Jo's skills in negotiating settlements are particularly notable, as is her ability to 'wear three hats' (labor, third party liability, safety) in addressing accident litigation involving third parties.  Jo may be able to better address the occasional perception that she does not promptly respond to some inquiries by ensuring appropriate messages are available in voice mail and Notes.  Due to the elimination of the administrative manager position in the Department, Jo had to play a perhaps larger role in the day-to-day affairs of the Department, a largely thankless role she has discharged competently.  While there have been some complaints by non-exempts, that is to be expected, particularly given this population.

Although Miller does not dispute the "meets expectations" rating was appropriate, she concluded that the claims in Day's modified evaluation were "deliberate falsifications and were intended to set the stage for further retaliatory action against her."  She wrote a three page response to the evaluation in which she accused Day of changing his tone towards her in the evaluation because, in recent times, she had become "a more vocal opponent of the company's recalcitrance on the diversity initiative."  In a footnote of her memo, Miller also wrote: "I think that the answer lies in the fact that these gentlemen are all cronies of yours who seem to have a propensity to attack black female employees."

Miller received a salary increase, grant of stock options, and bonus payment following the 2002 evaluation.

Following Miller's departure from Praxair, the company hired an outside law firm to conduct an internal investigation.[6]  The investigation resulted in Day's receipt of negative

---

[6]The details of the investigation are not part of the record before the Court because they are protected by Praxair's attorney-client privilege.

comments in his 2002 performance appraisal and a letter of discipline in connection with his action regarding Miller's performance evaluation.

<u>Conversation with Del Shannon</u>

In the course of inquiring about her 2002 performance evaluation, Miller claims that she was informed by Human Resources Director Del Shannon that he had lost respect for her for the following reasons: the position she had taken in representing an Asian American female employee; that her judgment was affected whenever minority employees were involved; that Miller interjected herself too much in matters involving minority employees; and that her past employment at the NLRB tainted her judgment and she sided too much with the NLRB on labor issues.

<u>John Day's Comments</u>

Miller alleges that she was told by John Day on three to four occasions from the summer of 2000 to the summer of 2001 that "we just shot another black male" in reference to Praxair's firing of black male employees.  She also alleges that John Day told Miller that she should not "think like a minority."

<u>Oakland NLRB Issue</u>

In the spring of 2002, Miller was responsible for handling Praxair's legal response to the National Labor Relations Board ("NLRB") on an issue involving a Praxair employee in Oakland. She alleges that she learned that Sam Castillo, a member of the human resources department, deliberately gave her false and misleading information that she relied upon in writing a letter to the NLRB.  She also alleges that various individuals working at Praxair thwarted her efforts to remedy the statements or investigate the conduct of Castillo or any other parties responsible.

Workers' Compensation Retaliation

In the summer of 2002, Miller met with General Counsel Chaifetz to note "her concerns regarding possible retaliation that she believed had already taken place against [law department employee Christine Mommens] for engaging in protected activity" under the Workers' Compensation statutes.  Miller alleges that Chaifetz instructed her that if Mommens filed a workers' compensation claim, Miller should fire her.  Mommens has attested that she never complained about safety issues at Praxair, and Praxair also denies these events.

Resignation

On August 22, 2002, Miller resigned her employment with Praxair, effective September 13, 2002.  General Counsel Bill McClure's reaction was to ask her if there was anything the company could do to get her to stay.

In September 2002, the Vice President of Human Resources, Sally Savoia, offered Miller the opportunity to speak internally with the General Counsel and/or the CEO regarding any concerns she might have and the reasons that she wanted to resign.  Miller declined.  Savoia also offered to have the Miller speak with a representative of Wright Associates, a human resources consultant, reasoning that Miller might be more comfortable talking to the consultant about her reasons for leaving Praxair than she would be talking to Praxair employees.  Miller also declined this offer.

Miller then filed charges with the Connecticut Commission on Human Rights and Opportunities and the Equal Employment Opportunity Commission.  The Equal Employment Opportunity Commission issued a Notice of Right to Sue letter which was received on or about February 23, 2005.  The Connecticut Commission on Human Rights and Opportunities issued a

Release of Jurisdiction on or about March 2, 2005.

Miller brings suit in this Court on a ten-count complaint.[7]  In summary, she alleges that she resigned from employment at Praxair as a result of the intolerable working conditions occasioned by defendants' harassment of and retaliation against her, and therefore that she was constructively discharged.


## II.      Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P.

---

[7]The operative pleading is the Third Amended Complaint, filed December 19, 2005.  On September 18, 2006, the Court issued the following order dismissing some counts:

> ORDER. . . .  As to the motion to dismiss, Counts 1 and 3 are dismissed, absent objection, as to the individual defendants. That portion of Count 2 that invokes Conn. Gen. Stat. Section 46a-58(a) is granted, absent objection, as to all defendants. That portion of Count 2 that invokes Conn. Gen. Stat. 46a-60(a)(1) is dismissed as to the individual defendants, absent objection. Count 8 is dismissed in its entirety, absent objection. The balance of the motion to dismiss is denied, but without prejudice to filing a motion for summary judgment.

Although the complaint is at times unclear, the Court has attempted in this Ruling to match each count with the defendant or defendants to which it was intended to apply.  Absolute precision on this point, however, is unnecessary because the Court finds that all of the counts have as elements constructive discharge, an adverse employment action, or hostile work environment, and Miller has not presented evidence as to any of those elements that is sufficient to survive summary judgment.

-9-

56(c)); accord <u>Miner v. Glen Falls</u>, 999 F.2d 655, 661 (2d Cir. 1993).  A dispute regarding a

material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.

 Because this is a discrimination case where intent and state of mind are in dispute,

summary judgment is ordinarily inappropriate.  <u>Carlton v. Mystic Transp.</u>, 202 F.3d 129 (2d Cir.

2000).  "The summary judgment rule would be rendered sterile, however, if the mere incantation

of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."

<u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d. Cir. 1985).  A plaintiff may not rely on conclusory

statements or mere contentions that the evidence in support of summary judgment is not credible.

<u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 532 (2d Cir. 1993); <u>Henry v. Daytop Village,

Inc.</u>, 42 F.3d 89, 97 (2d Cir. 1997) ("The plaintiff must adduce evidence consisting of more than

mere conclusory or unsubstantiated statements.").  Similarly, a plaintiff, as the nonmovant, may

not rest "upon the mere allegations or denials" in its complaint to demonstrate the existence of a

genuine issue of material fact.  Fed. R. Civ. P. 56(e). Therefore, after discovery, if the nonmoving

party "has failed to make a sufficient showing on an essential element of [its] case with respect to

which [it] has the burden of proof," then summary judgment is appropriate.  <u>Celotex</u>, 477 U.S. at

323.


## III. Discussion

 Praixair and the individual defendants move for summary judgment on all surviving

counts.  They argue that because all of these counts require proof of constructive discharge and

an adverse employment action, which the Miller cannot establish, she cannot prevail.  They also

attack the individual counts of the complaint on other grounds.

Counts Four, Five, Six, Seven, and Ten are causes of action that rely on Miller's allegation of constructive discharge.  Count One (Conn. Gen. Stat. § 31-51q), Count Two (CFEPA), Count Three (Title VII), and Count Nine (42 U.S.C. § 1981) depend, if not on constructive discharge, on Miller's allegations of retaliation or harassment, and therefore she must present evidence of an adverse employment action or hostile work environment.  See, e.g., Conn. Gen. Stat. § 31-51q (requiring discipline or discharge of employee on account of employee's exercise of certain constitutional rights); Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006) (requiring adverse employment action for Title VII retaliation claim); Crocco v. Advance Stores Co. Inc., 421 F. Supp. 2d 485 (D. Conn. 2006) (explaining Title VII and CFEPA hostile work environment standard).  Because Miller has not presented evidence upon which a reasonable jury could find constructive discharge, an adverse employment action, or hostile work environment, summary judgment is granted as to all of her claims.

A.    Constructive Discharge

The standard for constructive discharge is demanding.  A constructive discharge occurs when "the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation."  Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983) (internal quotations and citations omitted).  "Case law generally focuses on two parts of this standard: the employer's intentional conduct and the intolerable level of the work conditions."  Petrosino v. Bell Atlantic, 385 F.3d 210, 229 (2d Cir. 2004).  The standard for constructive discharge is not merely whether the employee's

working conditions were difficult or unpleasant.  Stetson v. Nynex Service Co., 995 F.2d 355,

360 (2d Cir. 1993).  Rather, "a claim of constructive discharge must be dismissed as a matter of

law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer

deliberately created working conditions that were so difficult or unpleasant that a reasonable

person in the employee's shoes would have felt compelled to resign."  Id. at 361 (internal

citations and quotations omitted).  A constructive discharge claim must entail something more

than what is required for an ordinary sexual harassment or hostile-environment claim.  See

Pennsylvania State Police v. Suders, 542 U.S. 129, 154 (2004); Mack v. Otis Elevator Co., 326

F.3d 116, 128 (2d Cir. 2003) (finding that facts supported hostile work environment claim but

did not support a constructive discharge claim).

　　　　Since "the standard for constructive discharge requires an evaluation of how a reasonable

employee would behave 'in the employee's shoes,' the issue should generally be left to the trier

of fact."  Halbrook v. Reichhold Chemicals, Inc., 735 F. Supp. 121, 125 (S.D.N.Y. 1990)

(quoting Pena, 702 F.2d at 325).  However, the "reasonable person" standard is an objective

standard that "does not depend on such traditionally triable issues as the subjective reaction of

any particular employee to changed working conditions."  Id. at 126.  "A claim of constructive

discharge cannot survive a motion for summary judgment based only on the employee's

subjective beliefs about his working conditions.  Instead, the employee must present some

objective evidence of intolerable working conditions."  Zephyr v. Ortho McNeil Pharmaceutical,

62 F. Supp. 2d 599, 608 (D. Conn. 1999).  Even if certain factors, standing alone, are "legally

insufficient to support constructive discharge," the various conditions should not be treated as

"separate and distinct rather than additive," since "a reasonable person encounters life's

circumstances cumulatively and not individually." <u>Chertkova v. Conn. Gen. Life Ins. Co.</u>, 92 F.3d 81, 90 (2d Cir. 1996).

Miller points to several instances to support her claim of intolerable working conditions. First, she cites the defendants' refusal to investigate her claims regarding the Oakland NLRB case and Sal Castillo.  Second, she argues defendants' instruction to terminate an employee in violation of the Workers Compensation Act presented her with yet another ethical dilemma that posed intolerable working conditions.  Finally, relying on her complaint about race discrimination and retaliation in her memorandum to John Day regarding her 2001 performance evaluation, Miller claims the defendants refused to investigate her claim of race discrimination and retaliation.

Miller has not made out a prima facie case of constructive discharge because she has failed to present sufficient objective evidence to present a genuine issue of material fact that she was deliberately subjected to intolerable working conditions.  Miller presents only her own speculation for a jury to infer that John Day or Del Shannon, let alone any other Praxair employee, deliberately placed her in difficult ethical situations with the intent that she resign.  Of more consequence in this motion for summary judgment, however, is that Miller has not presented sufficient evidence that a reasonable person in her shoes would have felt compelled to resign.  Again, Miller provides only her own speculation, not the objective evidence necessary for constructive discharge, that the Oakland NLRB and Christine Mommens issues were comprising ethical situations.  Additionally, no rational jury could find that Praxair's lack of investigation in response to Miller's complaint of discrimination to John Day – in which she accused Day of having a "propensity to attack black female employees" – made her working

conditions intolerable, particularly when Miller herself took no formal steps to report

discrimination or initiate an investigation.  While these events, taken separately or together, may

have made Miller subjectively feel that her working conditions were extremely unpleasant, a

reasonable person in her shoes would not have found the working conditions so intolerable that

she would have felt compelled to resign.

        B.     <u>Adverse Employment Action</u>

       The Supreme Court recently wrote of adverse employment actions in the context of Title

VII: "We speak of material adversity because we believe it is important to separate significant

from trivial harms.  Title VII, we have said, does not set forth 'a general civility code for the

American workplace.'"  <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68

(2006).  "An adverse employment action is one which is more disruptive than a mere

inconvenience or an alteration of job responsibilities."  <u>Feingold v. New York</u>, 366 F.3d 138, 152

(2d Cir. 2004) (internal quotations and citations omitted)).  "Examples of materially adverse

employment actions include termination of employment, a demotion evidenced by a decrease in

wage or salary, a less distinguished title, a material loss of benefits, significantly diminished

material responsibilities, or other indices unique to a particular situation."  <u>Id.</u> (internal quotations

and citations omitted).

       Setting aside her allegation of constructive discharge, Miller alleges none of the

prototypical examples of adverse employment actions, such as termination, demotion, decrease in

salary, change of job title, loss of benefits, or reduced responsibilities.  Additionally, none of the

incidents Miller forwards can be considered, as a matter of law, adverse employment actions.

       First, Miller alleges an adverse employment action in CEO Reilly's "threat" to outsource

general liability litigation work.  This "threat," without more, is not an adverse employment action.  It is undisputed that no general liability work was ever outsourced, or that Reilly followed up on his comment in any way.  Therefore, even taking Miller's allegation as true that Reilly's comment was a threat, if falls into the category of trivial workplace annoyances that do not qualify as adverse employment actions.

Second, Miller alleges that Day's response to her Severance Pay Plan proposal – specifically that she needed to clear things with him and that the department should speak with one voice – was an adverse employment action.  However, as her supervisor on labor and employment issues, it was not an adverse employment action that Day require Miller to clear department-related matters through him.  See, e.g., Gomez v. Laidlaw Transit, Inc., 455 F. Supp. 2d 81, 90 (D. Conn. 2006) (holding that defendant's "criticizing her work, standing over her, not letting her leave, or leaving her a stack of papers, or her comment about being sick and tired of plaintiff's being sick," were not adverse employment actions).  Additionally, while Miller perceived this as a ban on her commenting outside the legal department on any matters related to the workplace, no rational jury presented with Day's email could find that it applied to anything other than labor department work.  As a matter of law, it is not an adverse employment action for Miller's labor and employment supervisor to demand oversight over her labor and employment work.

Next, Miller asserts that Day's altering of her 2001 performance appraisal was an adverse employment action.  More specifically, taking Miller's allegations as true, Day altered McClure's draft performance evaluation to make it more negative and even intentionally fallacious.  Once again, however, the performance evaluation had no negative employment consequences.  In fact,

Miller does not dispute that she deserved the "meets expectations" rating she received. Following the evaluation, Miller received a salary increase, grant of stock options, and bonus payment.  Therefore, Day's giving Miller a negative evaluation that had no tangible consequences was not an adverse employment action.  See, e.g., Gaynor v. Martin, 77 F. Supp. 2d 272, 277, 279 (D. Conn. 1999) (Goettel, J.) ("[C]laims that he received intentional and fallacious written warnings and critical evaluations as part of the Commission's agency-wide policy of discrimination and retaliation" did not "meet this requirement of a materially adverse employment action.").

Finally, Miller alleges that the defendants' hacking into her computer was an adverse employment action.  Miller, however, has not presented any evidence other than her own speculation that her computer was actually "hacked" into.  Further, she makes no allegation as to how this surveillance, if it did occur, was a materially adverse employment action.  Without even an allegation as to how this was disruptive to Miller's work, it cannot be an adverse employment action.

     C.    <u>Hostile Work Environment</u>

"When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' . . . Title VII is violated." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993) (citations omitted); <u>see</u> <u>Mack</u>, 326 F.3d at 122 (2d Cir. 2003).  In evaluating the severity or pervasiveness of the allegedly discriminatory workplace conduct, a court must look at all of the circumstances.  <u>See</u> <u>Harris</u>, 510 U.S. at 23.  A non-exclusive list of factors that courts consider in making such a determination includes "the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id.  Title VII is not "a general civility code," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998), and "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment."  Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004).

As to the frequency, "[t]here is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment."  Alfano v. Costello, 294 F.3d 365, 379 (2d Cir. 2002). The alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be pervasive."  Carrero v. New York City Housing Auth., 890 F.2d 569, 577 (2d Cir.1989); Kotcher v. Rosa and Sullivan Appliance Ctr., Inc., 957 F.2d 59, 62 (2d Cir. 1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

The standard for evaluating a hostile work environment claim is both subjective and objective: the victim must subjectively perceive the environment to be abusive so that it actually alters the conditions of the victim's employment, and the conduct must also be so pervasive or severe that a reasonable person would find the environment abusive.  Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997).  Here, Miller has failed to establish a genuine issue of material fact as to whether the conduct was so severe or pervasive that a reasonable person would find the environment abusive.

Miller asserts several incidents that the Court previously discussed in the context of

constructive discharge and "adverse employment action" that she claims contributed to the

hostile work environment at Praxair, including: Reilly's threatening Miller with outsourcing of

her work; the alleged hacking into her computer; Day's warning her not to communicate outside

the department without his approval; Day's issuing her a negative performance appraisal; and

Miller's being placed in compromising ethical situations with regard to the Oakland NLRB and

Christine Mommens.  None of these incidents, however, fall in to the category of "discriminatory

intimidation, ridicule, and insult," Harris, 510 U.S. at 21, that form the basis of a hostile work

environment claim.  Instead, all of the instances that Miller raises are essentially complaints

about how she was managed as an employee, and Miller has presented no evidence that they had

any undertone of racial discrimination.

Miller additionally forwards as evidence of a hostile work environment John Day's

comments about "shooting black males" and telling her "not to think like a minority," and Del

Shannon's telling her that she was interjecting herself too much into matters involving

minorities.  Miller alleges she became aware of "animus" towards her when she investigated the

reasons behind Day's comments in her 2001 performance evaluation.  Specifically, she details

how she approached Del Shannon, the human resources manager, "to determine what, if any,

concerns he might have regarding her performance or his relationship with her."  It was in this

meeting that Del Shannon told Miller, in response to her inquiry, that "her judgment was affected

whenever a minority employee was involved"; that she had interjected herself in too many

matters involving minority employees; and that his respect for her decreased as a result of an

occasion when Miller had assisted an Asian American female with a complaint of discrimination.

Miller also points to John Day's statements on three to four occasions from the summer of 2000

to the summer of 2001 that "we just shot another black male" in reference to having just fired another black male, and statement that Miller should "not think like a minority."  She argues that these comments, "especially knowing of Defendants' hostility toward diversity, towards the hiring of black males, and to Plaintiff's involvement in minority matters," would lead any reasonable person to the conclusion that Praxair was a "racially hostile work environment for all blacks."

In response, the defendants first argue that Del Shannon's and John Day's comments were not racially motivated.  Del Shannon argues he was simply responding to Miller's inquiry about his perception of her performance.  Likewise, Day explains that his comments about "shooting" people when they were fired were directed not only to black employees, but other employees as well, and were not racially motivated.  Shannon and Day's motivation, however, is a question of fact.

More convincingly, the defendants argue that even taking Miller's interpretation of the comments as true, they were not severe or pervasive enough to alter the conditions of the her employment and create an abusive working environment.  The comments Miller complains of–three to four of the same comment by Day over a year-long period, and a few comments in the context of one conversation with Shannon–are "a few isolated incidents of racial enmity," or "[c]asual comments, or accidental or sporadic conversation," that the Second Circuit had held do not constitute hostile work environment.  See Snell v. Suffolk County, 782 F.2d 1094, 1102 (2d Cir. 1986).  A reasonable person would not find these comments severe or pervasive enough to find the work environment abusive.  Moreover, Miller's own contention that her job performance never worsened as a result of the allegedly hostile environment is evidence that she did not even

subjectively find the environment abusive.  See Stepheny v. Brooklyn Hebrew School for Special Children, 356 F. Supp. 2d 248, 264 (E.D.N.Y. 2005) ("Plaintiffs' claims of a hostile work environment fail for an altogether different and independent reason.  They have proffered no evidence that the alleged harassment 'interfered with ... [their] job performance, a sine qua non of such a claim,' notwithstanding that certain of Ms. Black's comments may have been offensive.") (citations omitted).  Therefore, Miller has not presented a genuine issue of material fact as to hostile work environment.

In summary, while there may have been animus between Miller and one or more Praxair employees that caused Miller's working at Praxair to be unpleasant, she has not presented a genuine issue of material fact as to constructive discharge, an adverse employment action, or hostile work environment, which are essential to her claims.

D.    Individual Counts of the Complaint

The Court will also address several of the individual counts of the complaint.  Miller alleges in Count One violation of Conn. Gen. Stat. § 31-51q, which prohibits an employer from "subject[ing] any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state."  Miller's claim under Conn. Gen. Stat. § 31-51q fails because she cannot establish she was subject to discipline or discharge, as explained above, and because the speech that serves as the basis of her cause of action was made only internally within Praxair.  See, e.g., Emerick v. Kuhn, 737 A.2d 456, 469 (Conn. App. Ct. 1999) ("Because the plaintiff's allegations concern the expression of his opinions as to perceived wrongdoing on the part of upper management [], it is a matter between him and his employer

-20-

and, thus, is not protected speech.").

Miller's claims for wrongful discharge in violation of public policy and breach of implied contract and covenant of good faith and fair dealing in Counts Four and Five also fail because other statutory remedies exist through which Miller can seek relief.  See Canty v. Rudy's Limousine, 2005 WL 2297410, at * 4 (D. Conn. September 15, 2005) ("However, where the employee has another available statutory remedy for the complained-of violation, he may not also bring an action for breach of the implied covenant of good faith and fair dealing."); Rose v. James River Paper Co., 2 F. Supp. 2d 245, 255 (D. Conn. 1998) ("A plaintiff bringing a claim for violation of the implied covenant of good faith and fair dealing must also establish that he does not otherwise have an adequate means of vindicating that public policy."); Tracy v. New Milford Bd. of Educ., 2005 WL 1762439, at *1 (Conn. Super. Ct. July 1, 2005) ("It is well established that the public policy exception to the general rule baring wrongful discharge claims by at-will employees is not available if the employee has an adequate statutory remedy.") (citing Burnham v. Karl & Gelb, P.C., 252 Conn. 153, 159-61 (2000)).

In Count Six, Miller's allegations of tortious interference with contract fail because the individual defendants cannot be held liable for tortious interference with their employer's contract.  See Boulevard Associates v. Sovereign Hotels, Inc., 72 F.3d 1029, 1035 (2d Cir. 1995) ("[T]here can be no tortious interference of contract by someone who is directly or indirectly a party to the contract.") (internal quotation marks omitted); Kelly v. City of Meriden, 120 F. Supp. 2d 191, 199 (D. Conn. 2000) ("[A]n agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the

-21-

corporation liable for breaching its own contract.") (internal quotation marks omitted).  Thus, to survive summary judgment as to this claim, Miller "must allege and produce evidence that the agent used his power for personal gain."  While Miller summarily alleges in her complaint that Reilly, Chaifetz, and Day used corporate power for their own personal gain, she provides no specific allegations as to how they did so, and has adduced no evidence of how they were motivated by personal gain.

Miller alleges in Count Seven violations of Conn. Gen. Stat. § 31-290a(a), which provides that an employer shall not "discharge, or cause to be discharged, or in any manner discriminate against any employee because the employee has filed a claim for workers' compensation benefits or otherwise exercised the rights afforded" to him under the workers' compensation laws.  The statute "prohibits an employer from discharging or otherwise discriminating against an employee because the employee had filed a claim for workers' compensation benefits or otherwise exercised her rights under the act."  Mele v. City of Hartford, 270 Conn. 751, 767 (2004).  Because it is undisputed that Miller did not file a claim for workers' compensations benefits, her claim under Conn. Gen. Stat § 31-290a fails.

Finally, in Count Ten, Miller alleges violations of the False Claims Act, which provides relief for "[a]ny employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section."  31 U.S.C. § 3730(h).  Miller's claim under this section fails because she cannot establish that she engaged in activities in furtherance of a legal action under the False Claims Act as she never filed a claim under the False Claims Act and was

never involved in any investigation in furtherance of any claim filed under the False Claims Act.

**IV.     Conclusion**

For the reasons set forth above, the defendants' motions for summary judgment [Dkts. #

271 & 273] are GRANTED.  The defendants' counterclaims are dismissed without prejudice.

SO ORDERED this   18th   day of June 2009, at Hartford, Connecticut.


 /s/Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**